## Trevathan's Executor v. Dees' Executors, et al.

(Decided September 30, 1927.)

### Appeal from Calloway Circuit Court.

1. Executors and Administrators.—Evidence held to show that two items of an account in a claim against an estate were duplicates representing the same debt of testator, and not two separate obligations.

2. Executors and Administrators.—Evidence in asserting claim against an estate that the testator had made payments on the account within 5 years before the institution of the action to settle the estate, and had made a memorandum acknowledging part of the claim, and had returned for assessment certain property as agent for claimant held to defeat pleas of statute of limitations and laches.

3. Guaranty.—Where renewals of a note were taken by the owner without requiring a guaranty, the guarantor of original note was released.

4. Witnesses.—Evidence that, when testator had delivered an alleged gift of certificate of deposit, he had directed that witness be "taken care of" out of it held admissible as affecting the credibility of the witness testifying that the gift had been made.

5. Witnesses.—In view of Civil Code Prac. section 605, a witness to testator's alleged gift of certificate of deposit, whom the testator had requested the donee to "take care of" out of the gift, held competent and not within section 606, subsec. 2, providing that no person shall testify for himself concerning any transaction with one who is dead, since such request did not amount to a trust and created in witness no enforceable claim against donee.

6. Witnesses.—To make a witness incompetent, under Civil Code of Prac. section 606, subsec. 2, prohibiting witness from testifying for himself as to transactions with deceased persons, the witness must have a real, direct, present, certain, and vested pecuniary interest adverse to the representatives of the deceased.

7. Wills.—In order to create a percatory trust, the testator must point out with sufficient clearness and certainty the subject-matter of the intended trust.

8. Gifts.—Evidence held to support Chancellor's finding that before his death testator had given claimant certificate of deposit.

9. Gifts.—Where a testator before his death had a certificate of deposit issued payable to third party and delivered it to third party with the intention to transfer title, held, that there was a valid gift inter vivos.

10. Gifts.—Where testator before his death directed that his agent indorse and deliver bank stock to claimant, and this was done, held, that there was a valid gift.

11. Appeal and Error.—Chancellors finding on conflicting evidence that testator was mentally capable of making a valid gift of shares of bank stock just before his death cannot be disturbed by appellate court.

12. Trusts.—Where husband, after the death of his wife, had her bank stock transferred to his name, he held it as constructive trustee for his wife's estate except as to half to which he was entitled under the law allowing husband one-half of wife's personalty.

13. Executors and Administrators.—Where a suit to settle an estate was pending in the circuit court, the approval of the county court to a compromise with a claimant against the estate amounted to nothing, and the compromise was still subject to the approval of the circuit court where the suit was pending.

14. Trusts.—Donee of shares of bank stock, taking the stock with knowledge that the donor held the shares as constructive trustee of his wife's estate, took them subject to the trust.

15. Executors and Administrators.—Executors compromising a claim against the estate without the court's approval held liable for

paying claimant for stock, which the testator as constructive trustee had given to one of the executors who had full knowledge of the constructive trust, instead of requiring the executor to turn over the stock to the claimant.

16. Executors and Administrators.—Compromise by an executor must be shown to be for the interest of the estate.

17. Executors and Administrators.—Where executors did not show that a compromise with a claimant against the estate was for the interest of the estate, they were liable for the amount paid.

18. Executors and Administrators.—That testator received payment for 20 shares of stock and by mistake delivered two duplicate certificates representing same 10 shares did not create trust for 10 more shares among the shares held by the testator and later given to one of the executors, so that the estate was liable for the deficiency to purchaser and the gift to the executor was valid and not subject to a trust requiring him to give up 10 shares.

19. Executors and Administrators.—Where services of an attorney are rendered to advance the interest of an executor in his individual capacity, the executor will not be allowed a fee for services so rendered.

20. Executors and Administrators.—$6,000.00 held excessive allowance to executor for attorney's fees and reduced to $3,000.00, where, in controversies over several gifts and claims against the estate, two of the major controversies were over gifts which two of the executors claimed had been made by the testator to them.

J. M. BRUMMAL, J. D. VIA and W. A. BERRY for appellant.

WHEELER & HUGHES, CLEMAN & LANCASTER and RAINEY T. WELLS and J. C. SPEIGHT for appellees Dees' Ex'rs.

J. E. ROBBINS and E. P. PHILLIPS for appellee Cortelyou.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming in part and reversing in part.

This action involves the settlement of the estate of S. H. Dees, who died in Calloway county on the 16th day of April, 1923. He left no children or lineal descendants surviving him. His wife had died some 3 or 4 years prior to his death. By his will executed in October, 1922, he made a number of specific bequests, aggregating about $32,000, among which was a legacy of $6,000 to be paid to his niece, Mrs. Ella Cortelyou, and another of $5,000, payable to his sister, Alice E. Trevathan, at the rate of $25 per month, with the provision that should she die before the principal amount was exhausted the remainder should become a part of the residue of his estate. Mrs. Treva-

than was a sister of the whole blood. The only other
heirs or distributees at law that survived him were a
great number of descendants of his half brothers and
sisters who had died before he did. These descendants
are scattered all over the country. By his will, he ap-
pointed Jake Mayer, Ben Grogan, and his brother-in-law,
A. D. Thompson, executors of his estate. At the time of
his death, Mr. Dees was 77 years of age. Starting in life
as a poor boy, he had through his efforts and business
ability acquired an estate of approximately $100,000.
Most of his business life had been spent in connection
with banks, and especially with the Bank of Murray, in
Murray, Ky., and the Dees' Bank, in Hazel, Ky. He was
an officer of both these banks. His sister, Mrs. Treva-
than, who died while this suit was pending, it being re-
vived in the name of the appellant as her executor, was
an invalid and not in a very good financial condition. She
lived in the county adjoining that of Mr Dees' residence.
The record shows that Mr. Dees visited his sister on the
average of about once a year, and that he sent her from
time to time, small checks of $20 or so as presents. His
relations with his niece, Mrs. Cortelyou, who lived in Illi-
nois, were very cordial and pleasant, but the record
fails to show that he had very much, if anything, to do
with any of his other relatives. Mr. Dees, as this record
shows, was very much attached to the appellee Ben
Grogan, whom he had taken as a young boy into the bank
at Murray, and whose business career he had helped to
supervise and direct. He was also very much interested
in the appellee Jake Mayer, who was associated with him
in the Dees' Bank. So much confidence did Mr. Dees
place in Mayer that for the last couple of years of his life
he had Mayer under a recorded power of attorney attend
to practically all of his business for him. After Mr.
Dees died, Mrs. Cortelyou, his niece, presented a claim
against his estate for the sum of $24,983.48. She asserted
that she had sent her uncle money from time to time
to invest for her, and that he had not accounted to her
in full for such sums and the interest. The appellee
Jake Mayer also claimed that during Mr. Dees' lifetime
the latter had made him a present of a certificate of
deposit in the sum of $19,200. The appellee Ben Grogan
claimed that Mr. Dees had on the Saturday preceding
his death, which occurred on Monday, given him 86
shares of bank stock. It is on these three claims, to-

gether with some minor ones, which we will notice later in the opinion, that the battle of this action was waged. We will consider them separately.

## I. THE CORTELYOU CLAIM.

The record shows that in the year 1907 oil was discovered on the farm of Mrs. Cortelyou, in Illinois. The money which Mrs. Cortelyou obtained as the cash payment for her lease, together with the royalties thereafter paid her, she sent to her uncle in Kentucky, to be by him invested for her, as she was not versed in matters of business and knew very little about the investing of funds. There is practically no dispute in the record but that this was the arrangement between Mrs. Cortelyou and her uncle. The controversy in this case arises over how much Mrs. Cortelyou furnished her uncle to be invested by him, and whether or not Mr. Dees had fully accounted during his lifetime to Mrs. Cortelyou for such sums as were so intrusted to him. Partly by searching the records of a bank in Illinois from which she had purchased the drafts she sent to her uncle, and partly by the books of the bank with which Mr. Dees was connected, Mrs. Cortelyou undertook to establish her claim. An analysis of this evidence would extend this opinion beyond measure and would be of no benefit to the profession. Suffice it to say that we are convinced that the lower court correctly adjudged the amounts advanced by Mrs. Cortelyou to her uncle, with the exception of an item in her account of $1,500 bearing date, June 3, 1909. As to this, we are convinced that the appellant is correct in his contention that this is a duplicate of the item in that account of May 5, 1909. On this last-named date Mrs. Cortelyou secured from the Crawford County State Bank, at Robinson, Ill., a draft for $1,500 on the American Trust & Savings Bank of Chicago, Ill., payable to S. H. Dees. The back of this draft bears several indorsements, those of S. H. Dees, the Bank of Murray, the Louisville National Banking Company of Louisville, Ky., and the Continental National Bank of Chicago. It also bears an indorsement that it was paid through the Chicago clearing house June 5, 1909, which is just two days after an entry was made on the books of the Bank of Murray showing that $1,500 had been deposited to the credit of S. H. Dees, the money belonging to Mrs. Cor-

telyou.  On the 14th day of May, 1909, Mr. Dees wrote
Mrs. Cortelyou, among other matters, as follows:

> "I received your check for $1,500.  I have not
> found a note that suited me.  I will I think in a short
> time."

It is conceded that this letter is an acknowledgment
of the remittance of the draft dated May 5, 1909, and it
will be noted that on the 14th of May, when Mr. Dees ac-
knowledged its receipt, he then stated that he had not
as yet found an investment for it.  On June 30, 1909, Mr.
Dees wrote Mrs. Cortelyou, in part, as follows:

> "Well, Ella, I expect you thought it was a long
> time hearing from about your notes but it's so hot
> down here I have not done much of anything.  I
> send you a good note secured by a good piece of land
> worth $2,500 for $1,000. $88.  Leaves $400.  Yet I
> will send you a good note for that in a short time."

This letter is quite incompatible with the position
taken by Mrs. Cortelyou that between May 5th and June
30th she had sent him $3,000.  On the other hand, this
letter indicates that Mr. Dees did not deposit the draft
of May 5th until June 3d.  The date of the indorsement
on the back of the draft substantiates this view.  Mr.
Dees writes in May that he had not yet found an invest-
ment for Mrs. Cortelyou.  On June 30th he writes that
he had invested $1,100, apologizing for not having written
before, and says that he has $400 of her money still left.
If Mrs. Cortelyou is correct in her contention, Mr. Dees
should have then had $1,900 still left.  But he only says
that he has $400 still left.  Further, on the 2d day of Sep-
tember, 1909, Mr. Dees wrote Mr. Cortelyou acknowledg-
ing receipt of a check for $1,000.  In this letter he says:

> "Well, I got the last check for $1,000.  It makes
> $1,400."

This statement clearly means that Mr. Dees still
had the $400 mentioned in his letter of June 30, 1909.
Later, on the 15th of September, Mr. Dees wrote again
to Mrs. Cortelyou sending her a note for $2,000 and ask-
ing her for "$600 to balance."  This letter clearly dem-
onstrates that he had invested in this $2,000 note the $1,-
400 above mentioned.  From the foregoing, we think the
evidence is very clear and convincing that the items of

May 5 and June 3, 1909, are duplicates, and that the lower court erred in allowing both of them as debits against the Dees' estate. Appellant by a very ingenious system of assumptions has undertaken to show that Mr. Dees accounted in full to Mrs. Cortelyou for all of the money that he had received from her. But the theory of the appellant rests entirely on assumptions, and not on any substantial evidence found in this record which we have carefully read, and we are therefore of the opinion that with the exception of the duplication of the item referred to, the lower court correctly found the amount due to Mrs. Cortelyou from the Dees' estate.

Appellant insists that his decedent's pleas of the statute of limitations and of laches should have been sustained. But that he is in error about this is apparent from the facts that so late as 1919 Mr. Dees returned for assessment in Calloway county intangible personal property in his hands, as agent for Mrs. Cortelyou, amounting to $8,000 in value; that in that year he made a memorandum acknowledging that he then held $10,000 worth of notes belonging to Mrs. Cortelyou, and that within five years before the institution of this action he had made payments on this account to Mrs. Cortelyou for which she has given him credit in this settlement.

Mrs. Cortelyou, by a cross-appeal, is complaining that in the credits given the Dees' estate on her account is a note known in this record as the Shroader note. She insists that the evidence shows that this note, which was payable to Mr. Dees, was paid to Mr. Dees in his lifetime, and further, if she be in error about this, that Shroader is now insolvent, and that Mr. Dees in his lifetime had guaranteed the payment of this note. The evidence of payment of the Shroader note consisted of certain statements made by the maker, Shroader, in his testimony in this case. But his evidence of payment is so ambiguous and confused as that we cannot say that the Chancellor erred in his view that this not was still a subsisting and binding obligation. So far as the guaranty is concerned, the evidence shows that when Mrs. Cortelyou first began sending her uncle money, he invested $2,000 of it for her in a Shroader note, the payment of which Mr. Dees guaranteed by an indorsement on its back. The note was payable to Mr. Dees, and Shroader did not know Mrs. Cortelyou in the matter. The evidence further shows that this note has been renewed many times since it was orig-

inally executed, and that the guaranty on the first note was never renewed on any of the renewals as Mrs. Cortelyou well knew, and concerning which she made no objection. The renewals reduced from time to time the principal amount due until it stood at $1,620 at the time of Mr. Dees' death. Thus we see that Mrs. Cortelyou never exacted of her uncle any guaranty of any of the renewals. The renewals took the place of the original obligation. Thus Mr. Dees was released by these renewals without a guaranty from the guaranty on the original note. As the Shroader note, which, though payable to Mr. Dees, belonged in truth to Mrs. Cortelyou, was still in existence and a binding obligation at the time of Mr. Dees' death, the court very properly turned it over to Mrs. Cortelyou and credited the Dees' estate by the amount then due on this note.

Before passing to the other branches of this case, we may say that the appellant also appeals from that part of the judgment construing the will of Mr. Dees in so far as it left a legacy of $6,000 to Mrs. Cortelyou, but in his brief in this court the appellant specifically abandons his appeal on this point, for which reason we will not discuss it further.

## II.  CLAIM OF JAKE MAYER.

In the winter of 1922-23, Mr. Dees made a visit to Florida. A year or so prior to this time he had had a slight stroke, and although, as the evidence shows, it had not at all impaired the faculties of his mind or materially impaired those of his body, except for a short while after the stroke, Mr. Dees had since that time given up very active connection with his work. He returned to Murray the latter part of March, 1923. After his death, it was discovered that the appellee Jake Mayer held a certificate of deposit of the Bank of Murray for $19,200, payable to his order and showing on its face that it had been deposited by Mr. S. H. Dees. In part it read:

"This is to certify that S. H. Dees has deposited in this bank $19,200 payable to Jake Mayer or order 6 months after date."

It is the contention of Mr. Mayer that this certificate was given to him as a gift by Mr. Dees on the day of its date. The evidence in brief for the heirs of Mr. Dees,

who are contesting this alleged gift, is to the effect that when they had discovered that Mr. Mayer held this certificate and learned his position in regard to it, he stated to them that no one was present at the time Mr. Dees gave him the certificate; that the certificate shows on its face that Mr. Dees deposited this money as his own; and that, although he made it payable to Jake Mayer, this was because Mayer was his agent and he had the certificate so made in order that Mayer could easily negotiate it. There is also some contention that on March 30th Mr. Dees' mind was such that he was incapable of making a gift, but the record contains no substantial proof to that effect. Further, these heirs also claim that Mr. Mayer's conduct in settling a claim of the estate of Mrs. Dees against the estate of Mr. Dees, to which we shall hereafter refer, and his conduct in connection with the alleged gift of 86 shares of bank stock to Ben Grogan, later discussed herein, demonstrate that he was acting in a conspiracy with his coexecutors to loot the estate of Mr. Dees for the benefit of himself, of his co-executor Ben Grogan, and of the estate of Mrs. Dees in which his other coexecutor, the brother of Mrs. Dees, was heavily interested.

On the other hand, the testimony for Mr. Mayer is to the effect that on March 30th Mr. Dees came to the bank with a number of certificates of deposit belonging to him; that he had an employee of the bank named Marshall to calculate the principal and interest of these certificates, and that when this calculation disclosed that they amounted to a little over $19,100, he had Marshall draw a check on his checking account to make up the difference needed for $19,200, and directed Marshall to issue a certificate of deposit for this amount, payable to Jake Mayer, that Marshall did so, and handed the certificate to Mr. Dees, who in turn handed it to Jake Mayer with the request that Mayer take care of Marshall out of it, adding that they should keep quiet about this matter as it was nobody's business but his own. Mayer, of course, was an incompetent witness to establish these facts, and so he had to prove it by his witness Marshall. It is earnestly contended that Marshall was an incompetent witness as he was interested in the outcome of this case. This contention is based on the fact that Mr. Dees requested Mayer to take care of Marshall out of the certificate, and Mayer has since Mr. Dees' death an-

nounced his intention of carrying out Mr. Dees' request. Although the evidence of this indicated interest of Marshall in this case was admissible as affecting his credibility, it did not render him incompetent, under section 606 (2) of the Code. Section 605 of the Civil Code provides that, subject to the exceptions and modifications contained in section 606, every person is competent to testify for himself or another unless he be found by the court incapable of understanding the facts concerning which his testimony is offered. This section was designed to remove the old common law disability of witnesses arising out of their interest in the event of litigation. But these common-law disabilities were not entirely removed by this section, for it also provides that such removal is subject to the exceptions and modifications set out in section 606. The effect of such exceptions set out in section 606 is to retain the old common-law disabilities in the instances set out in that section. One of such exceptions is that found in subsection 2 of section 606. When a witness then is objected to under this exception of section 606 of the Code, as being disqualified because of interest in the event of the suit, the true test of his competency is by a resort to the common law. Such interest is thus defined and explained in Jones on Evidence, section 775:

> "The interest of the party to the transaction or communication with the deceased or incompetent person must be a *real, direct, pecuniary interest,* and one adverse to the representatives of the deceased. It has been held in some states that, if the estate of the deceased or incompetent person is not affected by the action, such testimony is competent, and may be received, even if it relates to transactions or communications with deceased or incompetent persons. The interest must also be *present, certain, and vested* to render the adverse party incompetent, for, if it is of a doubtful character, it affects only the credibility and not the competency of the witness. . . . An interest by the witness simply in the question involved did not disqualify, but he must have been so interested in the result of the suit as that he would gain or lose directly and immediately thereby, or that the record therein could be used as legal evidence either for him or against him in some

other suit as an establishment or disestablishment of the matters testified about by him.''

In the case of New York Life Insurance Co. v. Johnson's Adm'r, 72 S. W. 762, 24 Ky. Law Rep. 1867, may be found a like discussion of these principles. We there said:

''As we understand the rule, the disqualifying interest must be direct and certain—one that would charge the witness with a liability or exempt him from one—but a mere uncertain, remote or contingent interest would not disqualify one from being a witness.''

Was, then, the interest of Marshall in the outcome of this litigation, a present, certain, and vested one? Was he so interested in the result of this suit as that he would gain or lose directly and immediately thereby, or that the record therein could be used as legal evidence either for him or against him in some other suit as an establishment or disestablishment of the matters testified about by him? Had Mr. Dees, instead of making the gift as described by Marshall, bequeathed to Mayer this certificate of deposit with the request that Mayer look after Marshall, the latter would have had no enforceable claim to any part of the legacy. The request would not have amounted to a precatory trust. In Wood v. Wood, 127 Ky. 514, 106 S. W. 226, 32 Ky. Law Rep. 408, we said:

''In order to create a trust and make precatory words operative in a will, it must appear that the estate is not an absolute estate and that the disposition thereof is not unrestricted; that the subject of the devise and the devisees must be certain, and the trust definite, and the language used must be positive and imperative, and not such as would indicate a mere wish or desire on the part of the testator, which might be complied with or not at the pleasure or discretion of the legatee.''

Thus we see that, in order to create a precatory trust, the testator must point out with sufficient clearness and certainty, among other things, the subject-matter of the intended trust. Such certainty would have been lacking here for Mr. Dees merely asked Mayer to take care of Marshall, but to what extent and in what manner he would have liked for Mayer to take care of Marshall

he was silent. Thus we see he left all this to Mayer, and hence his request amounted to only that and would not have risen to the dignity of a precatory trust. Now, if this be true, had Mr. Dees made a legacy of this certificate of deposit, it is, a fortiori, true of this gift. Marshall has no enforceable claim against Mayer arising out of this request of Mr. Dees. Hence he has no such interest as above defined which would disqualify him as a witness for Mayer in this case.

In addition to Marshall's testimony, Mayer introduced proof to the effect that Mr. Dees had long prior to the date of this certificate of deposit stated that he was going to do something for Mr. Marshall. Mayer also showed that he and Grogan were almost like sons to the old man; that he had depended upon them in great measure during the latter years of his business life; that the old man had made specific bequests for those who were most naturally dependent upon him, thus indicating that he had done what he thought was necessary for them; that he was not interested in the vast number of nieces and nephews who would in large measure take his residuary estate, from all of which it is argued that it was perfectly natural for him to take care of Mayer and Grogan as he did. Although Mayer may not have acted with the candor that he should, and although there are some circumstances that suggest bad faith on his part, yet weighing the evidence, we cannot say that these matters outweigh the positive testimony of Marshall coupled with the other facts and circumstances proved by Mayer and set out above, and hence we cannot say that the Chancellor erred in holding that Mr. Dees did give to Mayer this certificate of deposit as Marshall said he did. In the recent case of Dickerson v. Snyder, 209 Ky. 212, 272 S. W. 384, may be found a discussion of the elements necessary to constitute gifts inter vivos and causa mortis. The gift of the certificate here in question measures up to the requirements set out in that opinion. The certificate was not the donor's personal obligation, but that of a third party, the bank. It was a thing in esse and actually delivered by Dees to Mayer with the intention thus to transfer to Mayer the title thereto. It was a valid gift inter vivos. The judgment of the lower court upholding this gift is therefore affirmed.

### III.  THE BEN GROGAN CLAIM

Mr. Dees was taken ill on Wednesday and died the following Monday.  After his death 86 shares of bank stock, of which part was that of the First National Bank of Murray, part of the Bank of Murray, and part of the Dees' Bank, showed up in the possession of Ben Grogan, having been assigned to him by Mr. Dees by Jake Mayer as Dees' agent.  In this action Grogan claims that Mr. Dees had made a gift of this stock to him on the Saturday morning preceding Mr. Dees' death.  By his proof Grogan shows that Mr. Dees had for a long time prior to his death expressed a determination to give to Grogan his bank stock, although at the same time expressing the fear that it would give Grogan "the big head."  On the Friday preceding his death, Mr. Dees sent for Mr. Mayer and had him bring to his sick room his will and his bank stock.  He then told Mr. Mayer that he was going to add a codicil to his will leaving his bank stock to Ben Grogan, but that he wanted to think about the matter over night. Mr. Mayer then placed the bank stock and the will in a safety deposit box.  Early the next morning, Mayer, Marshall, and Grogan met in the sick room of Mr. Dees.  The nurse was requested to step out of the room, but Grogan's witnesses say that this was at the request of Mr. Dees.

Mr. Dees then told Mayer to get his bank stock and, with the exception of certain shares which he had willed to certain charities, to indorse them and turn them over to Grogan.  The nurse was then called back into the room and told to listen to what Mr. Dees had to say.  The nurse is not absolutely clear as to whether Dees said that he was going to give his bank stock to Grogan and hoped it would not give him the big head, or that he had given his stock to Grogan and hoped that it would not give him the big head.  At all events, Mayer went out to the place of deposit of the stock, got the certificates, indorsed them, and delivered them to Grogan that Saturday morning. If this evidence produced by Grogan be the truth, then there was a valid gift of these 86 shares to Grogan. Meriwether v. Morrison, 78 Ky. 572; Dickerson v. Snyder, supra; 28 C. J. 640.  On the other hand, the evidence for the heirs is to the effect that Grogan, when quizzed by the heirs after the death of Mr. Dees, stated that the estate amounted to $100,000, which could not have been so if the Mayer and Grogan gifts were valid; that he first claimed that the gift was given to him on

the Friday preceding Mr. Dees' death; that he said that it was a verbal gift, and that he could prove it by 20 men; that when the suit was brought by the estate of Mrs. Dees against the estate of Mr. Dees, to which we shall hereafter refer, he said that he would not have contended for his gift had not that suit been filed; and lastly, that Mr. Dees' state of mind on Friday, Saturday, and Sunday preceding his death was such that he was not capable of making a gift.

We may at once dispose of this last contention by saying that the evidence was very conflicting on this point.   But it rather preponderated on Ben Grogan's side, and we are unable to disturb the finding of the Chancellor to the effect that Dees had mind enough to make the gift in question.   While the circumstances we have thus narrated are disturbing and show a remarkable lack of candor on the part of Ben Grogan, and one not entirely compatible with fair and square dealing, yet we are unable to say that it overturns the direct and positive testimony of Marshall and Mayer concerning the gift as we have above outlined it, coupled with the proof as to the expressed purpose of Mr. Dees to give this stock to Grogan and with the proof of those circumstances also present in the Mayer gift with reference to Mayer and Grogan being so close to Mr. Dees, almost the objects of his bounty, and the fact that Mr. Dees had taken care in his will of all those of his relatives for whom he had any especial affection or to whom he was under any real duty or obligation.

But it does not follow that Grogan was entitled to all of these 86 shares, which brings us to a consideration of the suit of Mrs. Dees' estate against Mr. Dees' estate, to which we have referred several times before in the course of this opinion.

### IV.   CLAIM OF MRS. DEES' ESTATE.

After the death of Mr. Dees, A. D. Thompson, one of his executors and a brother of the late Mrs. Dees, brought a suit to settle Mr. Dees' estate.  In this suit, the estate of Mrs. Dees made a claim against the estate of Mr. Dees for $30,000.  It is admitted that Mr. Dees, on the death of Mrs. Dees, took entire charge of her estate and managed and used it as his own to the day of his death.   There is some proof that Mrs. Dees had in her lifetime made a will leaving all her property to her

husband, but this will was never probated and has never been found. It may be that it was destroyed by her in her lifetime. Among other property left by Mrs. Dees and owned by her at the time of her death was 15 of the 86 shares of the bank stock given by Mr. Dees to Ben Grogan. On Mrs. Dees' death, Mr. Dees had this stock transferred to his name as Grogan well knew. It is obvious that when Mr. Dees took charge of this bank stock and had it transferred to himself he held it as constructive trustee for his wife's estate, but only to the extent of 7½ shares, as he was under the law entitled to one-half of the personalty left by his wife.

When the administrator of Mrs. Dees' estate made the claim he did against Mr. Dees' estate, the latter's executors entered into a compromise agreement with Mrs. Dees' administrator, whereby they agreed to and did pay her estate the sum of $7,000 in compromise of its claim. Although the suit to settle Mr. Dees' estate was then pending in the circuit court, the executors of his estate had this compromise approved by the county court. The approval of the county court amounted to nothing, and the compromise of the executors was still subject to the approval of the circuit court in which the suit to settle the estate of Mr. Dees was pending. In Daviess County Bank & Trust Co. v. Wright, 129 Ky. 21, 110 S. W. 361, 33 Ky. Law Rep. 457, 17 L. R. A. (N. S.) 1122, we said:

"The Statutes allow a suit at any time by the personal representative or any creditor or heir at law to settle the estate, and to distribute its assets. Upon the filing of such a suit the chancellor directs the administration henceforth. It is not competent, then, for the personal representative, unauthorized by the court, to enter into contracts by which its jurisdiction and control in the matter might be ousted, and the statutory rights of other litigants or claimants be changed or postponed."

The executors of Mr. Dees' estate, however, did not procure the approval of the circuit court of their compromise agreement, but A. D. Thompson, after the agreement had been made, dismissed that suit and then resigned as one of the executors of Mr. Dees' estate. However, in this action, Mayer and Grogan are asking that this compromise agreement be approved and they be allowed as a credit in their executors' account the payment

of $7,000 they made to Mrs. Dees' estate. The lower court approved such compromise and payment, and in so doing erred. Mr. Dees' estate was not liable to Mrs. Dees' estate for 7½ shares of the bank stock owned by Mrs. Dees at the time of her death. The record does not show that Mrs. Dees' estate was indebted to any one, and hence one-half of her personalty belonged to Mr. Dees. As to the other 7½ shares, Mr. Dees did hold them as constructive trustee for Mrs. Dees' estate, and when he undertook to give them to Ben Grogan, who not only was no purchaser for value, but also one who had full knowledge of the whole transaction, the latter stepped into his shoes and held such stock as constructive trustee. It was the duty of the executors, of whom Grogan was one, to require Grogan to turn over this stock to Mrs. Dees' estate, and for their failure to do so they must be charged.

Outside of the stock matter, the executors have made no showing in this case as would authorize the court to approve the compromise settlement they made. They make some vague allusions to money inherited by Mrs. Dees from her family and which she had on hand at her death. But when this is sifted down, it is shown that the amounts she inherited were small and the real estate she owned at her death probably accounts for them. There is no substantial proof that she owned or had on hand any large amount of money or other personal property, excluding the stock to which we have referred, at the time of her death. A compromise by an executor must be shown to be for the interest of the estate. Pullin's Adm'r v. Smith, 106 Ky. 418, 50 S. W. 833, 20 Ky. Law Rep. 1993. The executors have utterly failed to make such a showing here. Hence we cannot allow them as a credit in their executors' account this item of $7,000. To this extent the executors are liable to and must pay the estate. See Taylor v. Taylor's Ex'r, 218 Ky. 187, 291 S. W. 27.

## V. Mrs. Willie Lynn's Claim.

Mr. Dees in his lifetime sold to Mrs. Willie Lynn 20 shares of bank stock owned by him. He delivered to her two certificates, each for 10 shares. One of these certificates was a duplicate of the other. It seems that Mr. Dees, prior to this sale, had claimed he had lost the original certificate and had had the bank issue him a duplicate, which it did, but required no bond of him.

After his death, Mrs. Lynn discovered that one of her certificates was invalid, and she made a claim against the estate of Mr. Dees for the value of the stock represented by the duplicate certificate. The executors of Mr. Dees settled with her for the sum of $2,000, this being the fair market value of the stock. In this the executors acted wisely and well. It is urged, though, that Grogan should have given up 10 shares of the stock given him by Mr. Dees to settle this Lynn claim. But this contention is not sound. Mr. Dees did not hold any of his stock in trust or otherwise for Mrs. Lynn. He was under a duty to pay her for the duplicate certificate he had sold her. But the stock he owned was not held by him for her. Hence he could make a valid gift of it to Grogan. It was for his estate to settle with Mrs. Lynn, and this it has done. The judgment of the lower court in approving this settlement with Mrs. Lynn is affirmed.

## VI. ATTORNEY'S FEES.

The lower court allowed the executors an attorney's fee of $6,000 for the services rendered and to be rendered them by their lawyers in this case. True it is that the services rendered and to be rendered by the attorneys for Mr. Mayer and Mr. Grogan were well worth $6,000, but as we have stated the storm of this case centered about the gifts to Mayer and Grogan, and by far the greater part of the services so far rendered by these attorneys consisted in upholding these gifts. It is the rule that where the services of an attorney are rendered to advance the interest of the executor in his individual capacity, and not in his representative capacity, the executor should not be allowed a fee for his attorney on account of such services so rendered. Shields v. Shields, 192 Ky. 555, 234 S. W. 7; Goode v. Reynolds, 208 Ky. 441, 271 S. W. 600; Slaughter's Ex'r v. Caldwell, 216 Ky. 261, 287 S. W. 720. So the executors cannot in this case be allowed any attorney's fee for services rendered Mayer and Grogan in upholding their gifts. We are of opinion that a fee of $3,000 is a sufficient allowance to the executors for the services of their attorneys rendered and to be rendered to them as set out in the judgment for the estate, and that their attorneys must look to them individually for the rest of their compensation.

### VII.   Conclusion

The judgment of the lower court therefore, in so far as it affects Mrs. Cortelyou, is reversed, with directions to enter a judgment in her behalf for $9,682.69, with interest at 6 per cent. per annum from April 25, 1925, until paid.   The judgment on the cross-appeal of Mrs. Cortelyou is affirmed.   The judgment, in so far as it approves and ratifies the compromise of the executors of the estate of S. H. Dees, deceased, of the claim of the estate of Mrs. S. H. Dees against the estate of S. H. Dees, is reversed with directions not to allow such executors as a credit in their executors' accounts the payment of $7,000 made by them on this compromise and to charge them with such sum.   In so far as the judgment allows the executors an attorney's fee of $6,000, it is reversed, with instructions to allow such executors an attorney's fee for the services set out in the judgment the sum of $3,000.   In all other respects the judgment is affirmed.